## Commonwealth *v.* Stewart, Appellant.

Argued May 23, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Norman M. Yoffee,* for appellant.

*Marion E. MacIntyre,* Deputy District Attorney, with him *LeRoy S. Zimmerman,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 4, 1972:

This is a direct appeal from the judgment of sentence of life imprisonment imposed on Frederick Charles Stewart following his conviction by a jury in Dauphin County of murder in the first degree.[1] We reverse and order a new trial.

---

[1] The jury's verdict was returned on March 18, 1961, and sentence was imposed on the same day. No appeal was then entered; however, in 1969 we ruled Stewart had not intelligently waived his right to appeal and directed that he be permitted to file post-trial

Stewart was charged with killing his wife in a bar in Harrisburg by stabbing her with a butcher knife, and otherwise assaulting her with a beer bottle and a bar stool. After the jury was sworn and the trial commenced, defense counsel was informed by a juror on the panel that Fletcher Smith, the father of the victim of the killing, Dorothy Stewart, was on the panel of jurors from which the trial jury had been selected, and had been in the same room with the jurors who were hearing the case for as long as two and one-half days. (Stewart's counsel had a list of the panel of jurors in advance of trial, but for some reason not disclosed in the record, he did not know of the relationship of Fletcher Smith to the victim until so informed by the juror, and Fletcher Smith was never called for voir dire examination.) Defense counsel immediately moved for the withdrawal of a juror. The Commonwealth objected to the motion. The district attorney admitted he knew of the relationship before the trial jury was sworn, but had failed to bring it to the attention of the court or defense counsel. The trial court denied the motion without a hearing or an inquiry of the jurors selected to try the case, as to whether any of them had any type of conversation or association with Fletcher Smith before being accepted as jurors in the case.

The minimal standards of constitutional due process guarantees to the criminally accused a fair trial by a panel of impartial and "indifferent" jurors. *Irvin v. Dowd,* 366 U.S. 717, 81 S. Ct. 1639 (1961),[2] and 1 Burr's Trial, 416 (1807).

---

motions as if timely filed. See *Commonwealth v. Stewart,* 435 Pa. 449, 257 A. 2d 251 (1969). Subsequently, a motion for a new trial was filed and dismissed in the trial court. This appeal followed.

[2] As was stated in *Irvin v. Dowd* "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. In

Given this premise, it appears to us that what was said by the Supreme Court of the United States in *Turner v. Louisiana,* 379 U.S. 466, 85 S. Ct. 546 (1965) is apropos instantly. Therein, the Court dealt with the following factual problem. Petitioner Turner was tried over a three-day period for the crime of murder, and found guilty. Two principal witnesses for the prosecution were deputy sheriffs for the county who gave very damaging testimony for the state and their credibility was vigorously attacked on cross-examination. The jurors were sequestered and were placed in the custody of the county sheriff, which meant the jurors were under the control of deputy sheriffs. Two of the deputy sheriffs who were in continual contact with the jury in this capacity were the two deputies who were the key witnesses for the state. Defense counsel challenged this practice and requested a mistrial. A brief hearing was held which established the deputies freely mingled and conversed with the jurors; however, the motion was denied on the grounds there was no showing either deputy had talked with any member of the jury about the case itself. Notwithstanding the lack of evidence

re Oliver, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682; Tumey v. State of Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749. 'A fair trial in a fair tribunal is a basic requirement of due process.' In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt 155 b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199, 80 S. Ct. 624, 4 L. Ed. 2d 654. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155, 25 L. Ed. 244." Id. at 722, 81 S. Ct. at 1642.

with regard to the deputies discussing the case with the jurors, the Supreme Court found a due process violation and reversed the conviction.

The Court initiated its examination of the case with the following general discussion of this area of the law: "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. 'The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law.' Sinclair v. United States, 279 U.S. 749, 765, 49 S. Ct. 471, 476, 73 L. Ed. 938. Mr. Justice Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that, in spite of forms they are extremely likely to be impregnated by the environing atmosphere.' Frank v. Mangum, 237 U.S. 309 at 349, 35 S. Ct. 582, at 595, 59 L. Ed. 969 (dissenting opinion).

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. What happened in this case operated to subvert these basic guarantees of trial by jury. It is to be emphasized that the testimony of Vincent Rispone and Hulon Simmons was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether Wayne Turner was to be sent to his death. To be sure, their credibility was assailed by Turner's counsel through cross-examination

in open court. *But the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality.* Cf. Rideau v. State of Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663." (Emphasis added.) Id. at 472-73, 85 S. Ct. 549-50. The underscored section of this quote is particularly important because it must be noted that the Court speaks of "potentialities." In *Turner* there was no proof the deputies spoke to the jurors about the case, just as in our case there is no proof the victim's father spoke to the jurors; however, the Court stressed the potentialities of harm for the sake of absolute fairness. In this vein the Court went on to say: "It is true that at the time they testified in open court Rispone and Simmons [the deputies] told the trial judge that they had not talked to the jurors about the case itself. But there is nothing to show what the two deputies discussed in their conversation with the jurors thereafter. And even if it could be assumed that the deputies never did discuss the case directly with any member of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. *We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial— an association which gave these witnesses an opportunity, as Simmons put it, to renew old friendships and make new acquaintances among the members of the jury.*" (Emphasis added.) Id. at 473, 85 S. Ct. at 550. Certainly if there is "extreme prejudice inherent in this continual association," there is even more prejudice or opportunity for prejudice and bias, where the father of the victim is with the jury, confined in a room for as long as two and one-half days. During this

time the subtle emotions of hate for the appellant, or pity for the father of the deceased could clearly develop, even assuming the father said nothing about the case. Moreover, if the father did say something about the case, the credibility of the appellant could have been destroyed, and his credibility was of the utmost importance to the defense since they were making every effort to reduce the degree of the crime through the appellant's testimony when he related to the jury how the murder came about.

We realize that what we are in effect doing is presuming prejudice for the sake of insured fairness; however, this is exactly what the United States Supreme Court did in *Turner,* supra. Moreover, the Court employed this same presumption in the Sam Sheppard case where there was a question of prejudice as a result of pretrial stories in the news media. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S. Ct. 1507 (1966).[3] See also

---

[3] "The undeviating rule of this Court was expressed by Mr. Justice Holmes over a half a century ago in Patterson v. State of Colorado ex rel. Attorney General, 205 U.S. 454, 462, 27 S. Ct. 556, 558, 51 L. Ed. 879 (1907) : 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' Moreover, 'the burden of showing essential unfairness * * * as a demonstrable reality,' Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S. Ct. 236, 242, 87 L. Ed. 268 (1942), need not be undertaken when television has exposed the community 'repeatedly and in depth to the spectacle of [the accused] personally confessing in detail to the crimes with which he was later to be charged.' Rideau v. State of Louisiana, 373 U.S. 723, 726, 83 S. Ct. 1417, 1419, 10 L. Ed. 2d 663 (1963). In Turner v. State of Louisiana, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), two key witnesses were deputy sheriffs who doubled as jury shepherds during the trial. The deputies swore that they had not talked to the jurors about the case, but the Court nonetheless held that: 'even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme preju-

*Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S. Ct. 236 (1942); *Estes v. Texas,* 381 U.S. 532, 85 S. Ct. 1628 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417 (1963). As was aptly stated by Mr. Justice BLACK in *In re Murchison,* 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955), "our system of law has always endeavored to prevent even the probability of unfairness."

In the instant case, the Commonwealth argues the voir dire examination would have revealed and cured any prejudice which would have come about as a result of the association between the victim's father and the jurors. This argument, although superficially appealing, fails when analyzed in depth. As noted before, defense counsel learned of this information after the jury was sworn and thus there was no reason for the defense to question the prospective jurors on voir dire about this inherently prejudicial situation.

The Commonwealth also points out that each juror selected for the trial was asked on voir dire whether or not they knew anyone connected with the case, and each responded negatively. Assuming this to be true, the possibility still remains that some incident occurred

---

dice inherent in this continual association * * *.' At 473, 85 S. Ct., at 550.

"Only last Term in Estes v. State of Texas, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), we set aside a conviction despite the absence of any showing of prejudice. We said there: 'It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.' At 542-543, 85 S. Ct. at 1632. And we cited with approval the language of Mr. Justice Black for the Court in In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955), that 'our system of law has always endeavored to prevent even the probability of unfairness.' " Id. at 351-52, 86 S. Ct. 1516-17.

during their association on the jury panel with the victim's father, which was so inherently prejudicial that it rendered impartiality impossible. Cf. and compare, *Irvin v. Dowd,* supra; *Marshall v. United States,* 360 U.S. 310, 79 S. Ct. 1171 (1959); *United States ex rel. Fletcher v. Cavell,* 287 F. 2d 792 (3d Cir. 1961); *United ed States ex rel. DeVita v. McCorkle,* 248 F. 2d 1 (3d Cir. 1957).

Judgment reversed and a new trial is ordered.

Mr. Justice ROBERTS joins in the opinion of the Court and files a separate concurring opinion, in which Mr. Justice NIX and Mr. Justice MANDERINO join.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I join the majority but wish to voice my disapproval of the then assistant district attorney's failure to inform either the trial court or appellant that the victim's father was on the jury panel. Both the ABA Code of Professional Responsibility and the ABA Project on Standards for the Prosecution Function command that "the prosecution should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused; mitigate the degree of the offense, or reduce the punishment."[1] If the prosecution has the professional responsibility of informing a defendant of "available evidence . . . negat[ing] . . . guilt", so to is it the prosecution's duty to disclose the information here involved. Certainly the assistant district attorney had an obligation to inform the trial court of the presence of the victim's father on the jury panel.

The practical effect of the assistant district attorney's failure to comply with the professional standards

———

[1] ABA Code of Professional Responsibility and Canons of Judicial Ethics, Canon 7, EC 7-13; ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function, §3.11(a) (Approved Draft 1971).

required of his quasi-judicial office[2] is to unnecessarily burden the judicial process and the efficient administration of criminal justice with yet another trial of appellant. Had the assistant district attorney met the professional standards required of his office the additional delay, expense and waste of judicial and professional resources now necessary would have been avoided.

Mr. Justice NIX and Mr. Justice MANDERINO join in this opinion.

---

[2] The ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function §1.1(c) (Approved Draft 1971), specifically provides that "[t]he duty of the prosecutor is to seek justice, not merely convict."