401 A.2d 320

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Charles HORTON, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 5, 1979.

Decided May 1, 1979.

116

Lester G. Nauhaus, John H. Corbett, Jr., Asst. Public Defenders, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Kemal Alexander Mericli, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

Appellant, Charles Horton, was tried before a judge and jury and convicted of murder in the third degree for the

stabbing death of Donald Bell. Post-verdict motions were denied, and sentence of five to ten years imprisonment was imposed. This direct appeal followed.

Appellant raises two issues here. First, he contends he should be discharged, arguing that the evidence was insufficient to sustain the jury's finding of guilt of murder in the third degree. As has been often said by us, when called upon to review the sufficiency of the evidence to sustain a criminal conviction, an appellate court is to determine whether all the elements of the crime charged have been proven beyond a reasonable doubt. Because the fact finder is free to believe all of, part of, or none of the evidence, we view all the evidence and all inferences properly deducible from it in the light most favorable to the prosecution as verdict winner. *Commonwealth v. Toney*, 474 Pa. 243, 378 A.2d 310 (1977); *Commonwealth v. Rose*, 463 Pa. 264, 344 A.2d 824, 825 (1975).

Viewed in this light, the evidence presented at appellant's trial established the following. Appellant had been dating a woman by the name of Antoinette Marie McMillan. About ten days prior to the homicide of which appellant was convicted, McMillan began to date the victim, Donald Bell, while continuing to see appellant. On December 11, 1976, Bell arrived at McMillan's apartment shortly after 5:00 P.M. They ate dinner and watched television together. Later in the evening, appellant telephoned. McMillan indicated that she had company and appellant hung up. Shortly thereafter, Bell discovered that the tires to his automobile had been slashed. While Bell went to get new tires, McMillan walked to a nearby bar where she confronted appellant, accusing him of cutting the tires. Appellant denied any knowledge of the incident.

Later that evening, McMillan and Bell were again at her apartment when the telephone rang for the second time. Bell answered and entered into a lengthy conversation with appellant. A short time later, appellant knocked at the door. An argument between Bell and appellant ensued at

the door, and lasting about ten minutes. According to McMillan, appellant was holding Bell by the shirt, although Bell did nothing to fight back. McMillan testified that she then saw appellant take what appeared to her to be two punches to Bell's chest at which point Bell staggered out the door.

Another witness, Anthony Davis, saw the men standing at the doorway. He saw one reach out as if to punch the other in the stomach. Davis then saw one of the men tilt over, stumble down the steps, and fall to the ground. Davis stated that he saw the assailant clean his knife and walk away.

Another witness, Barbara Griffin, saw appellant walk up the steps to McMillan's house and knock on the door. She saw Bell open the door, after which it appeared that appellant was punching Bell, who then fell out of the doorway. Griffin stated that appellant kicked Bell as he lay on the ground. Two other witnesses also observed the incident and saw appellant kicking Bell while he lay on the ground.

■ Appellant now argues that this evidence was insufficient in that it failed to show that appellant acted with "malice," a necessary element of the crime of murder in the third degree. *Commonwealth v. McFadden*, 448 Pa. 277, 292 A.2d 324 (1972). Appellant's contention is totally lacking in merit: proof of the use of a deadly weapon on a vital part of the victim's body is sufficient to permit the fact finder to infer that the defendant acted with malice. *Commonwealth v. Gause*, 459 Pa. 595, 330 A.2d 856 (1975).

In this case, the prosecution established through eyewitnesses to the incident, that the victim collapsed to the ground after having been "punched" several times in the chest and stomach by appellant. Although these prosecution eyewitnesses did not testify to having actually seen the knife in appellant's hand at the time they saw him "punch" the decedent, one stated that he saw the assailant cleaning a knife immediately after Bell fell to the ground. The prosecution also established, through the testimony of the examining forensic pathologist, that Bell died as the direct result

of three stab wounds to the chest, one of which penetrated to a depth of three and one-half inches, one to a depth of four inches, and one to a depth of four and one-half inches. One of these blows was delivered with such force that it also resulted in a fractured rib. Several of the prosecution's eyewitnesses testified that appellant kicked the decedent as he lay on the ground. This evidence was sufficient to establish beyond a reasonable doubt that appellant acted with malice.

■ Appellant also argues that he should be granted a new trial. The facts surrounding this claim are as follows. Appellant's trial commenced on March 28, 1977. In the presence of the judge and jury panel from which his jury was later selected, appellant was asked by the court clerk how he pleaded to the charges against him.

"CLERK: How do you plead, guilty or not guilty, to the felonies wherewith you stand charged?"

Appellant responded: "GUILTY."

The court clerk then turned to appellant's defense counsel and said "Counselor advise your client," whereupon defense counsel whispered something into appellant's ear, and appellant then said to the court, "Not guilty." The jury panel was then sworn, and individual voir dire was conducted in the trial judge's chambers. Twenty-five jurors had been interviewed (6 having been selected), when the following occurred during examination of the 26th juror:

"Q. [By the Court] Do you know of any facts or situations, personal, physical or otherwise, that would interfere with or impair your ability to serve as a fair and impartial juror in this trial?

A. Well, when he made his plea he said guilty first. I think that is bothering me.

Q. Would you explain that?

A. Well, I just wonder if—if that is, has preconditioned my mind or anything when he said that and his lawyer said, told him to plead guilty.

Q. You think, you are asking it as a question, do you think that has, in fact, preconditioned your mind?

A. I think it has.

Q. Do you think that would prevent you from being a fair and impartial juror?

A. I think it would. I have been thinking about it all night. I can't get it out of my mind."

Having heard this juror's statement, defense counsel requested that the entire panel be disqualified.

"[Defense Counsel]: I am also going to—this is not a pleasant thing for me to do, I'm going to request the entire panel be disqualified. I was not aware that what [appellant] said was audible enough for the jury panel to hear it. We already had one honest enough to explain what he was thinking about what occurred, why would he say nothing unless he was guilty and it preconditioned him. I'm afraid that the entire panel or a large portion of the panel may be deluded by that statement."

This motion was refused by the court. Defense counsel then asked to be allowed to pose an appropriate question to the jurors to determine whether or not any other jurors had heard appellant respond "guilty" when asked how he would plead, and, if so, whether they had been predisposed by that statement to believe appellant guilty. This request was also denied by the trial judge.

The trial court erred when it refused to examine the jurors regarding this incident. In *Commonwealth v. Stewart*, 449 Pa. 50, 52, 295 A.2d 303, 304 (1972), we said,

"The minimal standards of constitutional due process guarantees [sic] to the criminally accused a fair trial by a panel of impartial and 'indifferent' jurors. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and 1 Burr's Trial, 416 (1807)." (Footnote omitted.)

The *Stewart* court then concluded that the presence of the victim's father on the jury panel created a sufficient possibility that prejudicial remarks may have been made by him to other potential jurors so that reversal of the judgment of sentence was required to rectify "even the probability of unfairness." *Id.*, 449 Pa. at 57, 295 A.2d at 306.

If one potential juror heard appellant's inadvertent response and felt preconditioned by it to find appellant guilty, the possibility that others on the panel also heard it and were similarly influenced was very real. Furthermore, it is not unlikely that the juror who admitted hearing appellant say "guilty" also discussed that observation with other prospective jurors in order, perhaps, to verify the accuracy of his recollection of appellant's plea by determining whether anyone else heard appellant say "guilty." Although there was no proof that such conversations actually occurred, we are dealing with "potentialities," and as said in *Stewart, supra,* the potentiality of harm required the grant of a new trial even though there was ". . . no proof that the victim's father spoke to the jurors." *Id.,* 449 Pa. at 55, 295 A.2d at 305. It would have cost little of the court's time, and would have traveled a long way towards assuring that appellant would be tried by a fair and impartial jury, if the court had granted appellant's request that the jurors be questioned regarding the incident.

Judgment of sentence is therefore reversed and a new trial granted.