# Commonwealth v. Ludwig

C.P. of Allegheny County, no. CC 200114991.

*Stephi-Anna Kapourales, assistant district attorney,* for Commonwealth.
*Patrick J. Thomassey,* for defendant.

MANNING, *J.,* March 12, 2002—This matter comes before the court on a petition for writ of habeas corpus filed on behalf of the defendant, Gregory Ludwig. The district attorney of Allegheny County has charged Mr. Ludwig with one count of drug delivery resulting in death, 18 Pa.C.S. §2506 and one count of delivery of controlled substance, 35 P.S. 780-113(a)(32).[1] The complaint alleges that on May 19, 2001 the defendant:

"Committed murder in the third degree when he delivered, sold and distributed a controlled substance (namely methlynenedioxymethamphetamine (Ecstasy)) in violation of section 13(a)(30) of the Act of April 14, 1972 (P.L. 233, no. 64) known as the Controlled Substance, Drug, Device and Cosmetic Act and Brandy French W/F/16 died as a result of using the substance."

The charges were filed following an open inquest held by the coroner of Allegheny County, the Honorable Cyril

---

1. The defendant has not raised any claim involving this charge.

H. Wecht M.D., J.D., on August 23 and September 5, 2001. That inquest resulted in a recommendation by the hearing officer who presided at that hearing, John L. Doherty, Esquire, and Dr. Wecht that the defendant be charged with violating title 18, section 2506 and with third-degree murder. The coroner also recommended that Michelle Maranuk be charged with the same offenses. The district attorney, however, elected to charge the defendant only. Maranuk was not charged with any offenses.

A preliminary hearing was held before District Justice James E. Russo on October 19, 2001. Magistrate Russo concluded that the Commonwealth had established a prima facie case as to both offenses and ordered the defendant held for court. This petition was filed on the defendant's behalf on November 7, 2001, and set for hearing on November 16, 2001. On November 16 the court continued the matter to allow a witness called by the Commonwealth, Paula Wilson, the opportunity to consult with court appointed counsel when it became apparent that her testimony might be self-incriminating.

When the hearing reconvened on December 10, 2001, the Commonwealth presented an application for immunity order for the witness Wilson. The application was granted. After incorporating the testimony from both the coroner's inquest and the preliminary hearing, the Commonwealth presented testimony from Wilson. The court then took the matter under advisement.

In his petition, the defendant seeks relief on two grounds. First, he claims that the evidence is insufficient to establish a prima facie case because the Commonwealth failed to establish "malice," which defendant contends is an element of this offense. Second, he claims

that title 18, section 2506 violates the due process clauses of the Fourteenth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution because the section is too vague. Before turning to these claims, it is first necessary to review the evidence. In doing so, because one of the claims involves a pre-trial challenge to the sufficiency of the evidence, the court must view the evidence in a light favorable to the Commonwealth and give the Commonwealth the benefit of all reasonable inferences that arise from the evidence.

Brandy French, a 15-year-old sophomore at Quaker Valley High School, died on May 20, 2001. Dr Shaun Ladham, a forensic pathologist with the coroner's office, testified that French's death, "was a direct result of the methylenedioxymethamphetamine overdose, which led to irreversible brain damage, or hypoxic encephalophathy, which was manifested by the cerebral edema, plus clinical signs of lack of brain function." (Transcript of coroner's inquest, p. 43.) French took the drug while attending a concert, known as the X-fest, at the Post-Gazette Pavilion in Burgettstown, Pennsylvania. Within hours after ingesting it, she began to vomit, exhibit signs of confusion and slip gradually into unconsciousness.

The group that attended the concert with French took her from the concert to the home of Lewis Hopkins. Hopkins' mother, Rosalind Hopkins, was home when French was carried into the home and placed in a bed in an upstairs bedroom at around 9:45 p.m. French's condition continued to deteriorate, through the late evening. At one point, she stopped breathing and was resuscitated

by Paula Wilson. When several of the teenagers suggested to Mrs. Hopkins that they should call 9-1-1, she refused to summon the medical help that was clearly needed by French. According to several of the teenagers that were caring for French in the Hopkins home, Mrs. Hopkins repeatedly rebuffed their requests that the police or an ambulance be summoned, callously commenting that she did not want "her reputation harmed" by having the police come to her home. Eventually, however, showing the sense and concern that escaped Mrs. Hopkins, the teenagers decided to drive French to the hospital. They carried her out toward Robert Sontag's car. When she stopped breathing again, they laid her down in the driveway and attempted CPR. Mrs. Hopkins finally summoned an ambulance, which arrived and transported French first to Sewickley Valley Hospital and then to Allegheny General Hospital, where she died later in the day on May 20, 2001.

According to Paula Wilson, on the night before the concert she received a call from Michelle Maranuk who asked if Wilson's boyfriend, Robert Sontag, could give Maranuk a ride to a Dairy Queen restaurant in Beaver County. The purpose of the trip was to obtain Ecstasy from someone Maranuk had met and who she described as the defendant, Gregory Ludwig. (N.T. 10/19/01, p. 11.) With Sontag driving, Wilson in the front passenger seat and Maranuk and French in the rear seat, they drove to the Dairy Queen. During the drive, French and Wilson told Maranuk that they also wanted to buy an Ecstasy pill. (N.T. 10/19/01, p. 21.) They each gave Maranuk $20. The defendant arrived a few minutes after they did. He approached the Sontag vehicle and entered through

the rear passenger door. While Sontag drove around the block, the defendant gave Maranuk three small white pills and she gave him $60. Maranuk kept the pills with her until the next day at the concert, when she gave one each to Wilson and French.

The defendant challenges both the legal validity and the sufficiency of the evidence as to each of two elements in this offense. He claims that the mental element is too vaguely defined and that, to the extent that the mental element is sufficiently set forth, the evidence presented failed to establish that element. He also contends that the statute is too vague in defining the element of causation. The court will first address these claims as they related to the requirements of the law for a mens rea "a guilty mind" and the element of "malice."

Our criminal laws, from their ancient origins through the millennia of time, have continually prohibited two different classes of conduct. Crimes that are fundamentally and universally recognized as anathema to society are mala in se, wrongs in themselves, and include murder. The second class of crimes are referred to as mala prohibita, wrongs because society wants the commission proscribed. As pervasive and devastating as drug trafficking is in modern culture it still falls within that second class of crimes.

Generally speaking mala in se crimes require a criminal intent, the mens rea, described as a guilty mind. The ancient Latin maxim of the law was: Actus not facit reum nisi mens sit rea—"an act does not make one guilty unless his mind is guilty." Thus it came to pass to distinguish mala in se crimes from those simply prohibited by statute, the difference between murder, rape or robbery,

on one hand, and bookmaking, motor vehicle violations, and drug trafficking on the other, creations of social prohibitions not moral ones.

Our modern Crimes Code, in defining for us the requirements of criminal culpability, specifies that "a person is not guilty of an offense unless he acted intentionally, knowingly, recklessly or negligently *as the law may require* with respect to each material element of the offense." 18 Pa.C.S. 302. The mens rea, the mental state is cardinal to conviction and condemnation.

In the passage of section 2506 into law the legislature has coupled murder of the third degree a malum in se crime with delivery of a controlled substance a malum prohibition crime without defining the mental state, the sine qua non of criminal liability.

It is the failure of the legislature to recognize this distinction and its forlorn attempt to pass a law, which not only fails to recognize the distinction but also incorporates the unincorporable that brings this court to decide, as it must.

Defendant contends that the statute is unconstitutionally vague and therefore violates the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. The due process clause invalidates as void for vagueness any "criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or that is so indefinite that it encourages arbitrary and erratic arrests . . . ." *Commonwealth v. Stein,* 519 Pa. 137, 144, 546 A.2d 36, 40 (1988), citing *Colautti v. Franklin,* 439 U.S.

379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

This doctrine focuses both on actual notice to citizens and arbitrary enforcement. The United States Supreme Court, in *Smith, supra,* recognized, however, that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." 415 U.S. at 574, 94 S.Ct. at 1247-48. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." 415 U.S. at 575, 94 S.Ct. at 1247-48. If arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The void-for-vagueness doctrine is "a due process doctrine incorporating notions of fair notice and warning." *Commonwealth v. Potts,* 314 Pa. Super. 256, 268, 460 A.2d 1127, 1133 (1983), citing *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). In *U.S.*

*Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432, (1997), the Supreme Court provided a succinct description of the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution. The court wrote:

"There are three related manifestations of the fair warning requirement embodied in the due process clause. First, the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); accord *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Second, as a sort of 'junior version of the vagueness doctrine,' H. Packer, The Limits of the Criminal Sanction 95 (1968), the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. See *e.g., Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985); *United States v. Bass,* 404 U.S. 336, 347-48, 92 S.Ct. 515, 522-23, 30 L.Ed.2d 488 (1971); *McBoyle, supra* at 27, 51 S.Ct. at 341. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, see *e.g., Bouie, supra* at 357-59, 84 S.Ct. at 1704-1706; *Kolender, supra,* at 355-56, 103 S.Ct. at 1856-58; *Lanzetta, supra* at 455-57, 59 S.Ct. at 619-21; Jeffries, Legality, Vagueness, and the Construction of Penal Statutes, 71 Va. L.Rev.

189, 207 (1985), due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope, see *e.g., Marks v. United States,* 430 U.S. 188, 191-92, 97 S.Ct. 990, 992-93, 51 L.Ed.2d 260 (1977); *Rabe v. Washington,* 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed.2d 258 (1972) (per curiam); *Bouie, supra* at 353-54, 84 S.Ct. at 1702-1703, cf. U.S. Constitution, Article I, Section 9, cl. 3; *id.,* Section 10, cl. 1; *Bouie, supra* at 353-54, 84 S.Ct. at 1702-1703." 520 U.S. at 266.

A statute violates the due process clause either because it is vague on its face or it is vague in its application to the facts of a particular case. A statute that is challenged facially may be voided if it is "impermissibly vague in all its application," that is, there is no conduct that it proscribes with sufficient certainty. *Hoffman Estates, supra,* 455 U.S. at 495, 102 S.Ct. at 1192, 71 L.Ed.2d at 369. A statute can be challenged "as applied" if the law does not with sufficient clarity prohibit the conduct against which it sought to be enforced, *Palmer v. City of Euclid,* 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971). A party may test a law for vagueness as applied only with respect to his or her particular conduct; if a statute is vague as applied to that conduct, it will not be enforced even though the law might be validly imposed against others not similarly situated. Conversely, if a statute is not vague as applied to a particular party, it may be enforced even though it might be too vague as applied to others. To summarize, a law that is challenged for facial vagueness is one that is impermissibly vague in all its applications. A statute that is challenged as applied, how-

ever, need not be proven vague in all conceivable contexts but must be shown to be unclear in the context of the particular case.

This court concludes that title 18 section 2506 is facially invalid with regard to the mens rea, the mental element of the offense. On its face, section 2506 fails to set forth with requisite definiteness the mental state required for criminal liability. It fails to define itself as a strict liability statute and fails to define the mental state required to constitute a criminal act.

Neither the statute nor the legislative history reveals whether the legislature intended to create a strict liability offense or whether they intended to make this offense a new version of third-degree murder necessarily requiring proof of malice. The legislature, in its haste to enact laws to combat the very real danger posed by the trafficking in drugs, failed to carefully craft legislation that satisfies the constitutional requirement to specifically define the conduct prohibited and provide clear guidelines to law enforcement and the courts of its intended application. The ineptness in the drafting of section 2506 was aptly demonstrated when an amendment was made to this statute at its initial passage to include language set forth in subsection (c). In *Commonwealth v. Highhawk,* 455 Pa. Super. 186, 687 A.2d 1123 (1996), the Superior Court invalidated section 2506 because subsection (c) included language which provided: "Provisions of this section shall not be an element of the crime." The Superior Court found that this subsection nullified the attempt in subsection (a) to define the elements of a new crime, rendering the *entire statute* void for vagueness.

One must wonder whether the legislature reads what it passes into law before voting. The defects in the statute were obvious, yet the legislature chose not to correct, but to simply re-enact the same defective language. Given a chance in 1998 to remedy the defects apparent to the statute following the *Highhawk* decision, the legislature failed to consider the constitutionality of the statute. It simply re-enacted the statute deleting subsection (c) and chose not to remedy the other defects, ignoring the less than subtle hint given by the Superior Court in *Highhawk* at footnote 8, that the statute did not clearly define a scienter requirement.

In footnote 8, the Superior Court noted that the Commonwealth asserted the statute created a "strict liability" offense, however, the court declined to affirm that contention. The court acknowledged a statute enacted in New Jersey, creating a "strict liability" offense for deaths caused by violations of that state's drug laws.

It is conceivable, as the Commonwealth argued before the Superior Court in *Highhawk,* that the legislature intended to create a "strict liability" statute. On the other hand, language of the statute terming the offense "third-degree murder" requires courts to conclude that the legislature intended to incorporate all of murder's elements, including the element of malice. It is this inability to discern from the language of the statute what mental state is required that renders it, on its face, in violation of the due process mandate that a criminal statute provide notice of its reach.

The "touchstone of due process is protection of the individual against arbitrary government action." *Commonwealth v. Heck,* 341 Pa. Super. 183, 197, 491 A.2d

212, 219 (1985), citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); and *Commonwealth v. Hernandez,* 339 Pa. Super. 32, 488 A.2d 293 (1985). Where there is no clear standard of what mental state is required for criminal liability, there is a dire risk of arbitrary government action. Police officers, prosecutors, defense attorneys, judges and juries are left to try to extrapolate from the sparse language in section 2506 whether the act of delivery of drugs and a death resulting therefrom is all that is required for criminal liability or if there must be proof of a mens rea, criminal intent or malice. As our Superior Court noted quoting from *Grayned v. City of Rockford, supra:*

"[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Grayned v. City of Rockford,* 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). (footnotes omitted)" *Commonwealth v. Hughes,* 468 Pa. 502, 510, 364 A.2d 306, 310 (1976).

Section 2506 does not provide an explicit standard regarding the mental state required to allow the application of the law in a consistent matter. This statute, as written, invites "policeman, judges and juries . . . [to resolve cases] . . . on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory enforcement." *Hughes, supra.*

The allegations in this case exemplify these dangers. The Commonwealth chose to charge only Mr. Ludwig,

although its evidence reveals that at least one, if not two, other persons were in the chain of delivery. The Commonwealth proved that Michelle Maranuk obtained the drugs in question and then, depending on which of the Commonwealth's witnesses (Paula Wilson or Michelle Maranuk) is believed, Maranuk delivered the drug directly to Brandy French or delivered it to Paula Wilson who then delivered it to French. The evidence presented at the coroner's inquest was certainly sufficient, as the Honorable John I. Doherty and Honorable Dr. Cyril H. Wecht concluded, to charge Ms. Maranuk with the same offenses as Mr. Ludwig. Yet the Commonwealth made a decision not to charge Ms. Maranuk, even before she agreed to cooperate in the investigation of the matter and/or provide testimony. On the record before this court, Ms. Maranuk, unlike Ms. Wilson, has not been promised anything by the Commonwealth to secure her testimony. It is unclear whether the decision not to charge her was based on some agreement regarding her testimony, the exercise of the district attorney's discretion, or because the district attorney concluded, contrary to the position taken by his colleague in *Highhawk,* that the statute requires proof of malice. The vagueness of this statute, which allows this uncertainty, is why it must be stricken and the legislature given another attempt to create a law that meets the constitutional requirement to give fair notice of the conduct prohibited.

To the extent that the mental element, the mens rea, might be construed as sufficiently defined by the simple reference to "murder of the third degree" this court must also address the evidence presented to establish the elements of that offense, with regard to the defendant's claim

that the evidence is insufficient. The elements of section 2506 are delivery of a substance and a death resulting therefrom. Moreover, this court concludes that the plain language of section 2506(a), because it incorporates the offense of third-degree murder, requires that the Commonwealth establish that a defendant acts with malice.

Again, section 2506 has only been interpreted once in this Commonwealth. In *Commonwealth v. Highhawk, supra,* the Superior Court, although holding the statute unconstitutional, did conclude that the legislature intended to create a new criminal offense whose elements were set forth in subsection (a). The court wrote: "Reviewing section 2506 in light of this precedent, we find that it does indeed define the substantive crime of third-degree murder in those cases where death results from certain conveyances of controlled substances in violation of the Controlled Substance, Drug Device and Cosmetic Act." 455 Pa. Super. at 192, 687 A.2d at 1126.

The Superior Court in *Highhawk* was not asked to determine if "malice" was a required element. It did remark in footnote 8, that the Commonwealth had argued it was the legislature's intent to create a strict liability offense. The Superior Court declined to address this claim but referred to a New Jersey statute, which explicitly made drug violators strictly liable for deaths caused by the delivery of controlled substances. The New Jersey statute referred to by the Superior Court, N.J.S. §2C:35-9, provides on its face that it is a strict liability statute. The statute provides:

"(a) Any person who manufacturers, distributes or dispenses methamphetamine, ysergic acid diethylamide, phencyclidine or any other controlled dangerous sub-

stance classified in schedules I or II or any controlled substance analog thereof, in violation of subsection (a) of N.J.S. 2C:35-5, is *strictly liable* for a death which results from the injection, inhalation or ingestion of that substance, and is guilty of a crime of the first degree.

"(b) The provisions of N.J.S. 2C:2-3 (governing the casual relationship between conduct and result) shall not apply in a prosecution under this section. For purposes of this offense, the defendant's act of manufacturing, distributing or dispensing a substance is the cause of a death when

"(1) The injection, inhalation or ingestion of the substance is an antecedent but for which the death would not have occurred; and

"(2) The death was not:

"(a) too remote in its occurrence as to have a just bearing on the defendant's liability; or

"(b) too dependent upon conduct of another person which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability.

"(c) It shall not be a defense to a prosecution under this section that the decedent contributed to his own death by his purposeful, knowing, reckless or negligent injection, inhalation or ingestion of the substance, or by his consenting to the administration of the substance by another.

"(d) Nothing in this section shall be construed to preclude or limit any prosecution for homicide. Notwithstanding the provisions of N.J.S. 2C:1-8 or any other

provision of law, a conviction arising under this section shall not merge with a conviction for leader of narcotics trafficking network, maintaining or operating a controlled dangerous substance production facility, or for unlawfully manufacturing, distributing, dispensing or possessing with intent to manufacture, distribute or dispense the controlled dangerous substance or controlled substance analog which resulted in the death." N.J.S. §2C:35-9. (emphasis added)

There can be no doubt from the language of the New Jersey statute that its legislature created a strict liability statute. The Pennsylvania statute, because it defines this new offense in the context of the crime of murder in the third degree, just as plainly requires proof of malice, a fundamental component of murder of the third degree. The only purpose for the legislature to have incorporated third-degree murder in this statute was to sensationalize the crime without thought to the legal requirements of the offense. Murder of the third degree requires proof of malice.

In evaluating the evidence produced by the Commonwealth in the proceedings before this court, taken in the light most favorable to the prosecution and giving the Commonwealth the most advantageous interpretation of every inference, there is simply no evidence of malice whatsoever.

Malice is an essential element of third-degree murder, *Commonwealth v. Horton,* 485 Pa. 115, 401 A.2d 320 (1979); *Commonwealth v. McFadden,* 448 Pa. 277, 292 A.2d 324 (1972), and it is the distinguishing factor between murder and manslaughter:

"Malice express or implied is the criterion and absolutely essential ingredient of murder. Malice in its legal sense exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances . . .

"To summarize: If there was an unlawful killing with (legal) malice, express, or implied, that will constitute murder even though there was no intent to injure or kill the particular person who killed and even though his death was unintentional or accidental . . . ." *Commonwealth v. Commander,* 436 Pa. 532, 537, 260 A.2d 773, 776 (1970), quoting *Commonwealth v. Gooslin,* 410 Pa. 285, 189 A.2d 157 (1963). (emphasis added) (citations omitted)

Malice is defined for juries and fact-finders under our law in the Pennsylvania Standard Jury Instruction for third-degree murder, which provides:

"The word 'malice' [as] I am using it has a special legal meaning. It does not mean simply hatred, spite or ill will. Malice is a shorthand way of referring to three different mental states that the law regards as being bad enough to make a killing murder. Thus, a killing is with malice if the killer acts with first, an intent to kill, or second, an intent to inflict serious bodily injury or third, (wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty, indicting an unjustified disregard of the probability of death or great bodily harm, and an extreme indifference to the value of human life) (a conscious disregard of an unjustified and extremely high risk that his

actions might cause death or serious bodily harm)." Pa. Standard Jury Instructions, section 15 2502C.

Examining the three definitions with a commonsense review of the facts, there was no malice present. Neither Ludwig nor any subsequent distributor exhibited any intention to kill those engaged in the purveying of a substance called "Ecstasy," certainly did not intend serious bodily harm, and the day-to-day distribution of illegal drugs and illegally procured prescription drugs does not constitute wickedness of disposition, hardness of heart, cruelty or a recklessness of consequences such as to demonstrate an extreme indifference to the value of human life. There was absolutely no evidence presented that suggested that the defendant was aware or should have been aware that the delivery of the drug "Ecstasy," a hallucinogenic stimulant, created an "unjustified and extremely high risk that his actions might cause death or serious bodily harm."

Attempts to charge drug traffickers with murder where a drug user dies of an overdose are not new. The halls of this very courthouse echo with those attempts. In 1970, over 30 years ago, District Attorney Robert W. Duggan charged Edward "Apache" Bauer with murder in the death of two Mt. Washington men whom Bauer had provided with Dilaudid, a synthetic morphine, and whose voluntary ingestion resulted in death. Despite a stirring prosecution by Donald W. Minahan, Esquire, now deputy attorney general for Pennsylvania, no more staunch a "law and order" judge than the legendary and Honorable Samuel Strauss dismissed the murder charge ruling that the prosecution was over-reaching and could not establish "malice."

The Superior Court ultimately addressed the issue of whether a drug delivery that results in the death of the person who receives the drug is sufficient to establish of "malice" necessary for murder. In *Commonwealth v. Bowden*, 456 Pa. 278, 309 A.2d 714 (1973) the defendant was found guilty of murder of the second degree.[2] The evidence established that the victim purchased heroin and agreed to share it with the defendant. After injecting himself, the defendant in *Bowden* actually "administered" the fatal dose by injecting the victim. The victim died from heroin overdose. The Supreme Court overturned the conviction, finding that the element of malice was lacking. The court held "Under the facts of the instant case, we do not believe the necessary element of malice can be implied from Bowden's act of injecting Saunders with the drug, heroin. Initially, although we recognize heroin is truly a dangerous drug, we also recognize that the injection of heroin into the body does not generally cause death. Unfortunately, there are thousands of individuals who use or abuse heroin daily." *Bowden*, 456 Pa. at 284, 309 A.2d at 718.

The Commonwealth did not present any evidence concerning the dangerousness of "Ecstasy." While the court is cognizant of the inherent danger in any substance produced in a basement, garage or trailer by the invidious degenerates who manufacture mind-altering substances for thrill and profit, the record is simply devoid of any evidence from which the court could infer that "Ecstasy" is inherently dangerous and that the defendant should

---

2. In 1973 second-degree murder was defined as all murder other than first-degree. It is identical to the crime of third-degree murder in the current version of our Crimes Code.

have known that there was a high probability that death would result from its ingestion. Accordingly, the court concludes that the Commonwealth's evidence was not sufficient to establish a prima facie case of a violation of section 2506 due to the absence of any evidence establishing malice.

The court also finds that the application of the statute to the facts of this case violates the due process clause in the attempt to hold the defendant liable for the death of a person other than the person to whom the controlled substance was delivered. The statute provides that a person will be guilty of third-degree murder if that person violates sections 13(a), (14) or (30) of the Controlled Substance, Drug, Device and Cosmetic Act and "another person dies as a result of using the substance." 18 Pa.C.S. §2506(a). The statute in its application to the facts of this case, criminalizes conduct based on a particular result regardless of whether there was a causal connection between the conduct and the result. Under the facts of this case, the defendant did not deliver drugs to the person who died, he delivered them to a person who in turn delivered them to the deceased.[3] Any attempt to extend the reach of this statute to hold a person liable for the murder of any person other than the recipient of the controlled substance violates the due process clause. There are countless deaths that "result" from the ingestion of controlled substances delivered in violation of law. Any person who shares their prescribed medication with a

3. The Commonwealth's evidence on this point was inconsistent. Michelle Maranuk testified that she delivered the Ecstasy to Paula Wilson who in turn delivered it to French. Wilson claimed, however, that Maranuk delivered the drug directly to French.

friend could potentially be held liable for a violation of section 2506 if the recipient abuses the substance and dies or if the medicine is passed on to others and they die. Under the Commonwealth's proposed application of this statute, the defendant faces criminal liability for two voluntary acts of other persons: Michelle Maranuk's act of delivering the "Ecstasy" to Brandy French and French's decision to ingest "Ecstasy." The application of this statute to reach this far in the chain of causation violates the due process clause. There is no way a person of ordinary intelligence could contemplate that he or she would be liable for murder in the death of a person with whom there was no direct contact or to whom they did not deliver a controlled substance. The court will not succumb to the temptation of deciding whether the statute can validly apply where the person obtaining the substance dies from its use. In this case, it is clear that the statute's application offends the principles behind the due process clause.

Once again, the New Jersey statute is instructive in applying explicit guidelines regarding causation:

"Subsection (b) provides:

"(b) The provisions of N.J.S. 2C:2-3 (governing the causal relationship between conduct and result) shall not apply in a prosecution under this section. For purposes of this offense, the defendant's act of manufacturing, distributing or dispensing a substance is the cause of a death when:

"(1) The injection, inhalation or ingestion of the substance is an antecedent but for which the death would not have occurred; and

"(2) The death was not:

"(a) too remote in its occurrence as to have a just bearing on the defendant's liability; or

"(b) too dependent upon conduct of another person which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability."

Section 2506 fails to address the question of causation with the clarity that the New Jersey statute does. For this reason, the statutory language is too vague. Although the law of Pennsylvania does provide guidelines for causation, the failure of the statute to specifically require a causal connection beyond the simple fact that the death resulted from a delivery renders the statute too vague to satisfy the constitutional requirements of the due process clause.

While this court must invalidate a statute criminalizing the delivery of drugs resulting in death, this does not mean that this court or the judiciary condones such conduct. It is abhorrent. Abhorrent to the judiciary, to the community and to any and all reasonable citizens of this Commonwealth.

We as a society need to better address the problem of substance abuse and its criminal consequences than by continuing to pass legislation requiring the imposition of more severe penalties. To somehow believe that we can stop the abuse of legal and illegal substances by simply increasing the penalty upon the distributors while ignoring the addiction of the users collides with reality. Nations without substance abuse problems are nations where substances are not abused. To use the economic

*genre,* drug abuse is a demand side, not a supply side problem. If no one demands—wishes to use controlled substances—suppliers have no market. Without a market business ceases.

Unless and until we as a society choose to confront the "demand," the temptations, desires and addictions, we will hopelessly wallow in ineffective and unsuccessful efforts to end substance abuse by punishing the availability, the "supply." Increasing penalties for purveyors and extending criminal liability beyond the bound of logic and reason only increases the risk and the price involved in supplying an ever-expanding market.

In dealing with the "supply" side, prosecutors, and legislators seem bent upon ignoring the concept of personal responsibility. In a fruitless effort to amplify the blame for a death induced by a drug overdose our lawmakers ignore the fact that the death here, as virtually every overdose case is the result of the intentional and voluntary ingestion of controlled substances by the deceased. It is a compelling and grotesque tragedy that the life of a teenager is forfeit because young people seek the thrill of euphoria and "ecstasy" offered by the consumption of legal and illegal drugs often not fully assessing the risks, but, it remains part of our culture, an unfortunate scenario in our American way of life.

For the foregoing reasons the petition for writ of habeas corpus is Granted, the charge of drug delivery, resulting in death, 18 Pa.C.S. §2506, is Dismissed, and the defendant is discharged as to that offense Only.

## ORDER

And now, to-wit March 12, 2002 it is hereby ordered that the petition for a writ of habeas corpus is granted, the charge of drug delivery resulting in death, 18 Pa.C.S. §2506, is dismissed, and the defendant is discharged as to that offense only.