J-S31005-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AUSTIN EADDY | : | |
| | : | |
| Appellant | : | No. 738 EDA 2024 |

Appeal from the PCRA Order Entered February 7, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001537-2016

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY BOWES, J.: **FILED FEBRUARY 26, 2025**

Austin Eaddy appeals from the order that dismissed his petition filed
pursuant to the Post Conviction Relief Act ("PCRA"). We affirm in part, vacate
in part, and remand for further proceedings.

Appellant is serving a sentence of four to ten years of imprisonment for
convictions of attempted rape and indecent assault. We summarized the facts
and procedure of the case as follows on his direct appeal, and reproduce it
here at length due to their relevance to the issues we address *infra*:

> The Commonwealth alleged Appellant took the complainant's
> phone and sexually assaulted her in a parking garage at West
> Chester University. Appellant and the complainant were both
> students at the university, but did not know each other before the
> incident in question. Appellant and the complainant admitted
> drinking alcohol at separate parties before meeting.
>
> Surveillance video showed Appellant and the complainant meeting
> on the street at approximately 2:00 a.m. on April 1, 2016. They
> walked across campus together and eventually entered a parking

garage through a window in the concrete wall. Once inside the parking garage, the complainant handed Appellant a phone, and [he] put the phone in his pocket. Shortly thereafter, Appellant and the complainant embraced near a set of garage doors, which were closed at the time. The video showed the two apparently embracing, kissing, and engaging in other intimacies by the garage doors. Appellant and the complainant then walked from the garage doors to a space between two parked cars. As discussed below, Appellant and the complainant provided different accounts of what happened between the two cars.

An independent witness, Catherine Doherty, entered the parking garage. She could not recall where she parked and was pressing the button on her key fob. She then heard a distressed female voice asking for her phone. According to Ms. Doherty, she saw Appellant standing in front of the complainant. The complainant was on her back on top of the hood of a car, and the complainant's pants were down. When Ms. Doherty asked what was going on, Appellant stated, "Oh shit," and ran. The complainant left in a different direction than Appellant and was crying and pulling up her pants. Ms. Doherty initially pursued Appellant, but [he] exited the parking garage through the window in the concrete wall.

Ms. Doherty then caught up with the complainant. Ms. Doherty did not know the complainant before the incident, but learned that they both lived in the same residence hall. Ms. Doherty walked with the complainant to the residence hall and opened the door for her. A security guard noticed that the complainant's knee was bleeding and called West Chester University police. Although the complainant initially stated that she wanted to go to her room, [she] then told the guard she was sexually assaulted.

Officer Matthew Rychlak responded to the dispatch based on the security guard's initial call. As the officer was parking his car by the residence hall, he received an update that the complainant also reported a sexual assault. The officer entered the residence hall and initially attempted to interview the complainant in a common room of the residence hall. However, he then had Ms. Doherty enter the room and interviewed the complainant with Ms. Doherty present. The officer indicated that the complainant appeared more comfortable with Ms. Doherty present.

During this interview, the complainant told the officer she was sexually assaulted. [She] initially reported she was in the parking

- 2 -

garage when a black male approached her and forced her to engage in oral and vaginal intercourse.

An ambulance took the complainant to a hospital where she underwent a sexual assault examination. Ms. Doherty accompanied [her] to the hospital. A blood test revealed that the complainant's blood-alcohol concentration was over .20%. The sexual assault examination did not detect the presence of Appellant's DNA on the complainant. Officer Rychlak separately interviewed Ms. Doherty at the hospital, and she told the officer that she witnessed a rape.

. . . .

Appellant, who had left the campus sometime after the incident, was taken into custody on April 6, 2016. The Commonwealth subsequently filed an information charging Appellant with rape, attempted rape, indecent assault, and theft, among other offenses.

Appellant retained counsel and submitted numerous pretrial motions seeking discovery and the admission of evidence regarding the complainant . . . and Ms. Doherty. On June 12, 2017, the Commonwealth filed a motion *in limine* to preclude Appellant from referring to . . . the complainant's prior sexual conduct, including her text messages to third parties . . . and [also] Ms. Doherty's previous sexual assault.

On June 19, 2017, the trial court held a hearing on the Commonwealth's motion *in limine*. The trial court heard [the] parties' general arguments discussing the bases of the motion in general terms. . . . The trial court scheduled an *in camera* conference, with a court reporter present, for June 23, 2017, to hear arguments based on more specific facts.

On July 10, 2017, the trial court entered an order granting the Commonwealth's motion in *limine*. The trial court, in a footnote to its order, reasoned that (1) the Rape Shield Law, 18 Pa.C.S. § 3104, precluded Appellant from presenting the complainant's text messages regarding her "sexual proclivities," . . . and (3) the evidence of a previous sexual assault against Ms. Doherty w[as] irrelevant and any relevant purpose would be outweighed by the potential for prejudice. The docket and record contained no indication that the trial court held a formal *in camera* hearing.

- 3 -

However, the trial court later referred to "off the record" proffers made by Appellant.

. . . .

At trial, the complainant testified that she had been drinking at several parties before she met Appellant. [She] stated she could not recall the events after the last party that she attended. Specifically, the complainant testified that she did not remember meeting Appellant on the street, walking with him to the parking garage, or entering the parking garage. She could not explain why she appeared to hand Appellant a phone after they entered the garage. She also could not remember her interactions with Appellant while they were by the garage doors.

According to the complainant, she first recalled being with Appellant when they were between the two cars in the parking lot and Appellant told her "to suck his dick." Appellant pushed her head down, and when she tried to stop, Appellant pushed her aside and choked her. [She] testified that Appellant had his penis in her mouth. Appellant eventually made her get up and get face down on the hood of the car. [She] could not remember how Appellant had her phone, but recalled asking him to give back her phone. Appellant did not return her phone. Instead, she felt Appellant's penis at her "butt." [She] then heard a female, Ms. Doherty, call out. The complainant pulled up her pants and left.

The complainant verified that her phone was later found outside the garage. However, when the phone was returned to her, the screen was shattered. She testified that the screen of the phone was not damaged when she last remembered using the phone.

On cross-examination, the complainant acknowledged that she was convicted for having a false identification several months after the incident in the parking garage. [She] testified that she was interested in education and became an education major after the incident. She conceded that certain convictions or reports of misbehavior, such as indecently exposing herself, could disqualify her from becoming a teacher.

[Ms. Doherty testified as to the facts outlined above. During cross-examination, she conceded that she was not certain that she saw a rape but assumed so because Appellant ran away, that the only thing she heard the complainant say to Appellant was to

- 4 -

ask for her phone back, and that when she elected to chase Appellant when he fled, she did not trigger any of the available emergency call boxes.]

Appellant also testified at trial. [He] admitted that he was with the complainant before the incident in question. According to Appellant, he and the complainant met on the street, and they engaged in small talk while walking together across campus. Once they were outside the parking garage, he and the complainant began kissing and groping each other. Appellant testified that [she] suggested they "hang out" without worrying about a relationship. They then climbed into the parking garage though the window in the concrete wall.

Appellant testified that while they were inside the parking garage, the complainant asked him to hold her phone because it would not fit in the pockets of her shorts. [She] then handed him her phone, which he placed in his pocket. Appellant stated that he and the complainant began kissing while they were by the garage door. [She] pulled her top down to show him her pierced nipple. According to Appellant, he and the complainant agreed to "hook up," which Appellant believed meant having sexual intercourse. Throughout his testimony, Appellant suggested that the complainant took the initiative throughout the incident. Appellant further indicated that [she] pointed in the direction of the two cars and suggested they move to that area.

Appellant testified that while he and the complainant were between the two cars, Ms. Doherty interrupted them just as the complainant started to pull down her shorts. Appellant asserted that he and the complainant were both standing, and he was fully clothed, standing behind the complainant. Appellant denied choking or striking the complainant or otherwise forcing her to perform any sexual act. Appellant also denied that any sexual intercourse occurred during the incident.

Appellant testified that he and the complainant agreed to part ways when they saw yellow lights flashing from a car. He fled when he sensed someone approaching him. As he was exiting the parking garage, he heard the complainant yell out for her phone and state that he stole her phone. Once outside, Appellant dropped the complainant's phone in the grass by the parking garage.

In his arguments to the jury, Appellant asserted that the complainant was a willing participant in their interactions and voluntarily handed him her phone for him to hold as they reached the garage door. Appellant challenged the complainant's credibility and her claims that he assaulted her. Appellant specifically referred to the surveillance video and the absence of any evidence that he left DNA on [her].

Appellant also emphasized that Ms. Doherty was the first person to use the term "rape." He argued that Ms. Doherty misconstrued the incident and only assumed that she saw "a rape." Appellant suggested that Ms. Doherty's misunderstanding tainted the complainant's recollection of events, as well as the police investigation. Further, Appellant asserted that the police investigation into the reported sexual assault was deficient and that the police failed to corroborate all of the complainant's allegations before filing criminal charges.

The Commonwealth, in its argument to the jury, conceded that the initial interactions between complainant and Appellant were consensual. The Commonwealth asserted that the nature of the interaction changed when Appellant lowered his pants and exposed his penis, shortly before Appellant and the complainant moved to the area between two cars. The Commonwealth argued that once Appellant and the complainant moved between the two cars, he compelled her to engage in sexual intercourse.

As to the complainant's phone, the Commonwealth acknowledged that the surveillance video showed [her] handing Appellant a phone as they reached the garage doors. The Commonwealth argued that the phone seen on the surveillance video was Appellant's phone and not the complainant's. Further, the Commonwealth argued that Appellant, at some time before assaulting the complainant between the two cars, took [her] phone to prevent her from calling for help.

At the conclusion of trial, the jury found Appellant guilty of two counts of attempted rape and one count of indecent assault— without consent. The jury acquitted [him] of nine other sexual offenses and the one count of theft related to the complainant's phone.

On October 25, 2017, the trial court sentenced Appellant to four to ten years' imprisonment. The trial court determined that

- 6 -

> Appellant was not a sexually violent predator and ordered him to register as a tier-three sexual offender. The trial court ordered restitution in the amount of $582.99 to replace the complainant's phone.

***Commonwealth v. Eaddy*** ("***Eaddy I***"), 222 A.3d 838, 2019 WL 5268638, at *1-5 (Pa.Super. 2019) (non-precedential decision) (cleaned up).

On appeal, we affirmed the judgment of sentence in all respects but for the restitution component.[1] ***Id***. at *14. Since Appellant did not file a petition for allowance of appeal in our Supreme Court, his judgment of sentence became final on November 18, 2019. ***See Commonwealth v. Eaddy*** ("***Eaddy II***"), 309 A.3d 1057, 2023 WL 8052158, at *2 (Pa.Super. 2023) (non-precedential decision).

Appellant retained PCRA counsel, who filed a petition in September 2021 which the PCRA court dismissed as untimely. On appeal, we affirmed the dismissal but concluded that Appellant had the right to file a second PCRA petition alleging the newly-discovered-fact exception to the PCRA's one-year time bar pursuant to ***Commonwealth v. Peterson***, 192 A.3d 1123, 1132 (Pa. 2018) (holding that the untimely filing of a PCRA petition constitutes *per*

---

[1] As will be pertinent to our discussion, one of the issues Appellant raised on direct appeal was whether the trial court erred "by excluding from the trial record as irrelevant, any reference that [Ms. Doherty] . . . previously approached police about having been raped in the vicinity of campus, at an earlier point during the academic year." ***Eaddy I***, 2019 WL 5268638, at *5. Among our reasons for rejecting Appellant's challenge was our discerning "no abuse of discretion in the trial courts balancing of the possibility of confusing the jury against the relevance of Appellant's proffer and [his] right to confront Ms. Doherty." ***Id***. at *12.

*se* ineffective assistance of counsel and is a fact capable of satisfying 42 Pa.C.S. § 9545(b)(1)(ii)).[2] ***See Eaddy II***, 2023 WL 8052158, at *5.

Appellant promptly filed his second PCRA petition on April 8, 2022, asserting the § 9545(b)(1)(ii) timeliness exception, stating claims challenging the effectiveness of trial, direct appeal, and PCRA counsel. The PCRA court concluded that Appellant successfully surmounted the PCRA's time bar, and that PCRA counsel was ineffective *per se*, but nonetheless issued Pa.R.Crim.P. 907 notice of intent to dismiss the petition without a hearing because his challenges to trial and direct appeal counsel's performance lacked merit. ***See*** Notice of Intent to Dismiss, 1/17/24, at unnumbered 2-6 n.1. Unpersuaded by Appellant's response to the notice, the PCRA court dismissed his petition by order entered February 7, 2024.

This timely appeal followed. The PCRA court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and he timely complied. The PCRA court thereafter filed a memorandum pursuant to Rule 1925(a) specifying the documents in the certified record that addressed Appellant's claims of error.

---

[2] Appellant had sought a remand to challenge PCRA counsel's ineffectiveness with the first PCRA proceeding in accordance with ***Commonwealth v. Bradley***, 261 A.3d 381 (Pa. 2021). ***See Eaddy II***, 2023 WL 8052158, at *3. Although we acknowledged that ***Bradley*** arguably allowed the requested process, "for the sake of procedural transparency and simplicity," we decided that "the more appropriate pathway to addressing [Appellant's] claims [wa]s through a second petition to be addressed through the paradigm established by ***Peterson***." ***Id***. at *5.

Appellant posits that the PCRA court erred in dismissing the following claims:

1. Direct appeal counsel was ineffective in failing to argue that evidence of [Ms.] Doherty's prior sexual assault was admissible for the narrow and specific purpose of showing her perception bias.

2. Trial counsel was ineffective in failing to proffer that evidence of [the complainant's] relationship with her boyfriend was admissible to demonstrate her motivation to lie.

3. Trial counsel was ineffective in failing to object to the inadequate *voir dire* of a contaminated juror and in failing to request either the replacement of the contaminated juror or a mistrial

Appellant's brief at 4 (reordered for ease of disposition).

We begin with a review of the governing legal tenets. "In general, we review an order dismissing or denying a PCRA petition as to whether the findings of the PCRA court are supported by the record and are free from legal error." **Commonwealth v. Howard**, 285 A.3d 652, 657 (Pa.Super. 2022) (cleaned up). "It is an appellant's burden to persuade us that the PCRA court erred and that relief is due." **Commonwealth v. Stansbury**, 219 A.3d 157, 161 (Pa.Super. 2019) (cleaned up).

Appellant challenges the effectiveness of his trial and direct appeal counsel. To prevail, he must establish:

(1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, *i.e.* there is a reasonable

- 9 -

probability that but for the act or omission in question the outcome of the proceeding would have been different.

***Commonwealth v. Grayson***, 212 A.3d 1047, 1054 (Pa.Super. 2019) (cleaned up). This Court has elucidated these elements as follows:

A claim has arguable merit where the factual averments, if accurate, could establish cause for relief.

. . . .
When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest. This cannot be a hindsight evaluation of counsel's performance, but requires an examination of whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect the defendant's interests. Our evaluation of counsel's performance is highly deferential.

. . . .

To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

***Commonwealth v. Evans***, 303 A.3d 175, 182–83 (Pa.Super. 2023) (cleaned up). "The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail." ***Commonwealth v. Davis***, 262 A.3d 589, 595–96 (Pa.Super. 2021).

Additionally, we note that a PCRA petitioner has no absolute right to a hearing:

The PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied that there are no genuine

issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

*Commonwealth v. Roney*, 79 A.3d 595, 604 (Pa. 2013) (cleaned up).

With these principles in mind, we turn to Appellant's claims of error. Appellant's first two issues concern the failures of trial and direct appeal counsel to properly vindicate his right to cross-examine Ms. Doherty and the complainant, respectively. The arguable merit of these claims implicates the following principles:

The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that all criminal defendants enjoy the right to confront and cross-examine adverse witnesses. Moreover, the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

Although the right of cross-examination is a fundamental right, it is not absolute. The trial court may place reasonable limits on defense counsel's cross-examination of a prosecution witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant. Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Commonwealth v. Rosser*, 135 A.3d 1077, 1087–88 (Pa.Super. 2016) (*en banc*) (cleaned up).

Along these lines, our Rules of Evidence provide that "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules." Pa.R.E. 607(b). Appellant's first two issues involve one such statute: the Rape Shield Law. That enactment was designed "to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim. Moreover, the Rape Shield Law is intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants." *Commonwealth v. Jerdon*, 229 A.3d 278, 285 (Pa.Super. 2019) (cleaned up).

In that vein, the statute specifies:

Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible . . . except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104(a).

This Court has explained that, "[a]lthough the literal language of the Rape Shield Law would appear to bar a wide range of evidence, courts have interpreted the statute to yield to certain constitutional considerations implicating the rights of the accused." *Commonwealth v. K.S.F.*, 102 A.3d 480, 483 (Pa.Super. 2014). Pertinent to Appellant's claims:

> Evidence that tends to impeach a witness'[s] credibility is not necessarily inadmissible because of the Rape Shield Law. When determining the admissibility of evidence that the Rape Shield Law may bar, trial courts hold an *in camera* hearing and conduct a balancing test consisting of the following factors: (1) whether the proposed evidence is relevant to show bias or motive or to attack credibility; (2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive or to challenge credibility.

*Id*. at 483-84 (cleaned up).

Appellant first challenges the manner in which direct appeal counsel argued that the trial court erred in excluding evidence that Ms. Doherty had been a victim of sexual assault. By way of background, in its motion *in limine*, the Commonwealth contended that evidence that Ms. Doherty had claimed to be the victim of a sexual assault that she did not prosecute should be excluded because it had no bearing on her ability to truthfully tell the jury what she observed, and, even if relevant, was outweighed by unfair prejudice. On the latter point, the Commonwealth expounded:

> First, there is something inherently inflammatory about discussing an unrelated "sex" case. It needlessly draws attention to a prior incident. Second, there is a clear risk that the jury will unfairly and unjustifiably discount [Ms.] Doherty's testimony based on the stigma of her failure to prosecute. There are jurors who may infer that the reason [Ms.] Doherty chose not to report her own incident is that she was either lying or exaggerating. We would have to have a mini trial-within-a-trial to allow [her] to explain herself on an obviously collateral matter. For that reason, without the ability or the inclination to thoroughly go through the old case, the jury should not hear about it at all. If [Ms.] Doherty had indeed lied about a sexual assault in the past, perhaps it would be a different situation because that might go to her truth-telling ability. It is unfair and improper to quietly let the jury come to that conclusion by thrusting in front of them her failure to report. Therefore, [Ms.]

- 13 -

Doherty's previous sexual assault has no bearing on whether or not [Appellant] sexually assault[ed the complainant]. Any inquiry into her experience as a survivor of sexual assault would only divert attention from the [Appellant's] attack on the victim, which is the issue at trial.

Motion in *Limine*, 6/12/17, at 11-12 (cleaned up).

Direct appeal counsel challenged the trial court's ruling, asking this Court to consider whether the court erred "by excluding from the trial record as irrelevant, any reference that the eyewitness, who was the first person to allege that a 'rape' occurred, previously approached police about having been raped in the vicinity of campus, at an earlier point during the academic year." *Eaddy I*, 2019 WL 5268638, at *5 (quoting Appellant's brief at 6-7). Counsel argued "that Ms. Doherty **misunderstood the situation** in the parking garage, **tainted the complainant's recollection** of the incident, and triggered the faulty police investigation into the complainant's allegations of a sexual assault." *Id*. at *11 (emphases added).

The trial court justified its ruling as follows:

Following exhaustive research, the court is unable to locate any case law that opines upon the relevance of possible bias on the part of an eyewitness due to being a prior victim of a crime, not to mention the same crime as the accused. However, based upon the general rules of relevance, evidence of Ms. Doherty's prior alleged assault and her failure to press charges is not relevant to the determination of this case . . . . The only possible relevance is an as-yet unsupported inference that Ms. Doherty's prior experiences must have clouded her judgment in assessing what she saw in the garage that night. The details of Ms. Doherty's prior incident, or whether or not she chose to prosecute the case, do not have a tendency to prove [Appellant]'s guilt or innocence in this case . . . . Assuming *arguendo* that Ms. Doherty's prior alleged assault is relevant and creates a bias or motive to

- 14 -

fabricate, its probative value is outweighed by its danger of misleading the jury. Admitting evidence of the prior incident creates the risk of a trial within a trial, wherein Ms. Doherty's conduct seven months prior to this incident becomes the focus of the jury's attention.

*Id*. (cleaned up).

This Court rejected Appellant's challenge upon the following reasoning:

[F]ollowing our review of the record, the trial court was entitled to find that Appellant's proffer was irrelevant because Appellant only established that Ms. Doherty's prior sexual assault allegation did not give rise to a prosecution. We also find **no abuse of discretion in the trial court's balancing of the possibility of confusing the jury against the relevance of Appellant's proffer and** [**his**] **right to confront Ms. Doherty**.

*Id*. at *12 (cleaned up, emphasis added).

Appellant's PCRA challenge posits that direct appeal counsel rendered constitutionally-deficient performance by "failing to argue that evidence of [Ms.] Doherty's prior sexual assault was admissible for the narrow and specific purpose of showing her perception bias." Appellant's brief at 34. He explains:

While [A]ppellant does not contend that [Ms.] Doherty fabricated an elaborate lie to falsely accuse him, the eyewitness's immediate assumption that a sexual assault had occurred and her subsequent access to the vulnerable, intoxicated complaining witness prior to any report being made warrants the admission of evidence that her perception could have been the result of internalized bias. In light of her own experience as a recent victim of sexual assault, she very likely could have been predisposed to interpret a fully consensual encounter as nonconsensual and it is a fair inference that her deep and immediate concern colored the inebriated complaining witness's understanding of the situation. The fact that [Ms.] Doherty had recently experienced a campus sexual assault is relevant to and probative of her potential bias, and if asserted adequately, would have been admissible.

*Id*. at 36-37. Thus, Appellant insists, "properly formulated argument challenging the trial court's decision as to the admissibility of showing the potential for eyewitness bias would have been meritorious at the direct appeal stage." *Id*. at 35.

We disagree. First, the emphasized portions of this Court's decision on Appellant's direct appeal indicate that counsel did argue that the excluded evidence of Ms. Doherty's own assault caused her to misunderstand the import of what she saw and heard and thereafter taint the complainant's recollection. The trial court concluded that any probative value of the evidence toward that end was outweighed by the danger of confusing the jury by shifting the focus away from the events that Ms. Doherty witnessed and onto her own experiences. This Court held that this balancing and resultant exclusion of the evidence was within the trial court's discretion. Hence, Appellant's claim that appellate counsel did not pursue the perception-bias angle is belied by the record.

Second, Appellant's additional advocacy on the matter has not convinced us that the exclusion of the evidence was erroneous. The Commonwealth did not offer Ms. Doherty to opine about whether she witnessed a rape or other crime of sexual violence. It called her to relay to the jury the concrete facts about what she saw and heard when she found Appellant and the complainant in the parking garage. Hearing that Ms. Doherty herself had experienced a sexual assault would have had no bearing

- 16 -

upon the jury's assessment of whether she indeed saw the complainant on the hood of a car before Appellant fled the scene.

A review of the trial transcripts reveals that Ms. Doherty acknowledged that she was "freaked out" when she encountered Appellant and the complainant in the garage at 3:00 a.m. and only assumed the encounter was non-consensual because Appellant jumped through a window and fled the scene. She acknowledged that she did not witness any screams, struggle, or other signs of violence, and only heard the complainant ask if she could have her phone back. Additionally, Ms. Doherty testified that she did not tell the complainant that the complainant had been raped. Rather, when the complainant went into a separate room to be interviewed by the police, a police officer asked Ms. Doherty what she believed that she had seen, and she said rape. *See* N.T. Trial, 7/10/17, at 261-66. Given these concessions about the limited scope of what she witnessed, we conclude that there is no arguable merit to Appellant's claim that the trial court's decision to exclude an additional basis for Ms. Doherty to have merely assumed that she witnessed an assault. Thus, Appellant's first issue merits no relief.

Appellant next argues that trial counsel ineffectively opposed the Commonwealth's motion to exclude, in accordance with the Rape Shield Law, all evidence that the complainant had an existing sexual relationship with a third party. He maintains that text messages provided to the defense in discovery revealed "that she was in a relationship, serious enough to

constitute a significant, regular sexual partner" to whom she made "promises of fidelity," but counsel did not "adequately proffer [such] evidence . . . was admissible as motivation to fabricate the nonconsensual characterization of her encounter with [Appellant], in order to preserve her relationship." Appellant's brief at 29, 32 n.2. Citing *Olden v. Kentucky*, 488 U.S. 227 (1988), for the proposition that preservation of a relationship provides a motivation to lie about the consensual nature of the encounter with the defendant, Appellant contends that trial counsel should have challenged the Commonwealth's motion by arguing that the Rape Shield Law may not be utilized to exclude this "relevant evidence showing witness bias or attacking credibility." Appellant's brief at 27 (cleaned up).

Appellant further asserts that counsel lacked a reasonable basis for his failure to invoke *Olden*, and that he was prejudiced by counsel's failure to properly advocate the admissibility of the text messages and other evidence about complainant's relationship status, highlighting that the trial court indicated that it decided to exclude this evidence because counsel failed to explain "how, if at all, this evidence would demonstrate the alleged victim's bias against [Appellant] or call into question her credibility." *Id*. at 29 (quoting Order, 7/10/17, at unnumbered 3).

In *Olden*, the complainant, Starla Matthews, met the defendant at a bar. She testified that, after she became intoxicated, Olden tricked her into leaving with him and then raped her multiple times before, at her request,

- 18 -

dropping her off at the home of Olden's half-brother, Bill Russell. Russell "testified that on the evening in question he heard a noise outside his home and, when he went out to investigate, saw Matthews get out of [the] car. Matthews immediately told Russell that she had just been raped by [Olden]." *Olden*, 488 U.S. at 228. Olden, on the other hand, claimed Matthews propositioned him at the bar, they had consensual sex there before leaving for an ultimately unsuccessful search for cocaine, and, after additional consensual sex, he dropped her off at Russell's house. The High Court further explained:

> Although Matthews and Russell were both married to and living with other people at the time of the incident, they were apparently involved in an extramarital relationship. By the time of trial the two were living together, having separated from their respective spouses. [Olden's] theory of the case was that Matthews concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from [the] car. In order to demonstrate Matthews'[s] motive to lie, it was crucial, [Olden] contended, that he be allowed to introduce evidence of Matthews'[s] and Russell's current cohabitation. Over [Olden's] vehement objections, the trial court nonetheless granted the prosecutor's motion *in limine* to keep all evidence of Matthews'[s] and Russell's living arrangement from the jury. Moreover, when the defense attempted to cross-examine Matthews about her living arrangements, after she had claimed during direct examination that she was living with her mother, the trial court sustained the prosecutor's objection.

*Id*. at 229–30.

On appeal following his conviction, Olden asserted "that the trial court's refusal to allow him to impeach Matthews'[s] testimony by introducing

- 19 -

evidence supporting a motive to lie deprived him of his Sixth Amendment right to confront witnesses against him." *Id*. at 230. The Supreme Court agreed:

> In the instant case, [Olden] has consistently asserted that he and Matthews engaged in consensual sexual acts and that Matthews— out of fear of jeopardizing her relationship with Russell—lied when she told Russell she had been raped and has continued to lie since. It is plain to us that a reasonable jury might have received a significantly different impression of the witness'[s] credibility had defense counsel been permitted to pursue his proposed line of cross-examination.

*Id*.

Here, the PCRA court deemed the circumstances of the case *sub judice* to be more akin to those in ***Commonwealth v. Largaespada***, 184 A.3d 1002 (Pa.Super. 2018). In that case, Largaespada was tried for sexually abusing his daughter ("Victim"). He sought to introduce the following evidence to establish that Victim "had a motive to fabricate allegations of sexual abuse against" him: "(1) Victim had an on-going sexual and monetary relationship with her uncle; (2) Victim did not want Appellant to learn about the relationship; and (3) Victim wanted to leave Appellant's house so that Victim could continue the relationship with her uncle." *Id*. at 1006. This Court affirmed the trial court's refusal to admit the evidence, reasoning thusly:

> [T]he evidence of an extensive relationship between Victim and her uncle is just evidence of a relationship. The existence of a relationship alone is insufficient to infer a motive to fabricate. Even the fact that Victim did not want others to know about the relationship is insufficient to create a logical nexus that Victim would fabricate allegations about [Largaespada] to the police.
>
> This is true especially in light of the fact that [Largaespada] did not know about Victim's relationship with her uncle at the time

- 20 -

Victim reported the sexual abuse to the police. If [Largaespada] knew about the relationship and tried to end it, maybe there could be some evidence from which to infer that Victim made allegations to retaliate against [Largaespada] and, thus, had a motive to lie. But, there was no evidence of [Largaespada] ever learning about, let alone trying to end, the relationship. To hold otherwise would eliminate the protections of the Rape Shield Law because we would allow the existence of any sexual relationship to be basis for inferring a motive to fabricate.

*Id*. at 1007–08.

The PCRA court opined that Appellant was likewise asserting "that evidence of the [complainant]'s relationship status, in and of itself, would create a motive to fabricate a sexual assault, apparently in order to hide the fact that she cheated on her partner." Memorandum, 2/6/24, at unnumbered 3. It also stated that, "aside from [Appellant]'s claim in his petition, there is no evidence of record that the [complainant] actually was in a relationship at the time of this incident, aside from a passing reference to a classmate she was attracted to around when this incident occurred." *Id*. Therefore, it rejected Appellant's ineffectiveness challenge.

We disagree with the PCRA court's application of the law. Appellant does not allege that trial counsel had mere proof of the existence of a relationship to offer as the basis for the complainant's motive to lie. Rather, he contends that counsel was aware of evidence that the complainant was in a committed relationship in which she and her boyfriend pledged fidelity. Whether that committed relationship involved sex need not have been proffered to the jury in order to impeach the complainant. Indeed, while

Appellant argues that the romantic and sexual natures of the complainant's relationship with her boyfriend were admissible to impeach the complainant despite the constraints of the Rape Shield Law, he also contends that, even if the sexual conduct with her boyfriend must be excluded, "there was no reasonable basis for trial counsel to fail to cross examine the complaining witness regarding her relationship, without delving into her sexual conduct, and argue that it gave her a motive to lie."[3] Appellant's brief at 33.

Here, the relevant consideration was whether the fact that she promised not to have sex **with anyone else** was motivation for her to fabricate allegations of rape when she was caught with Appellant, where "Appellant, the complainant, the eyewitness, and the complainant's boyfriend were students at the same university, an environment where rumors and gossip abound and, despite denying that she needed assistance, the complainant was followed out

_____

[3] The Commonwealth suggests that Appellant waived the non-sexual aspect of his claim by not raising it in his Rule 1925(b) statement. **See** Commonwealth's brief at 37. Appellant's statement included the assertion that "[t]rial counsel was ineffective in failing to proffer appropriate grounds supporting the admissibility of crucial impeachment evidence: that the complaining witness was romantically and sexually involved with another student thereby motivating her to mischaracterize her interactions with [Appellant] as nonconsensual." Pa.R.A.P. 1925(b) Statement, 3/18/24, at 2. We deem this sufficient to include both the sexual and non-sexual aspects of the claim of error, each of which he raised in the PCRA court. **See** Memorandum of Law, 12/19/23, at 20-21 (asserting that the fact that the complainant had a boyfriend did not implicate the Rape Shield Law and suggested a motive to lie); Pa.R.A.P. 1925(b)(4)(v) ("Each error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court[.]").

of the parking garage by the eyewitness who had inserted herself into the situation." Appellant's brief at 12. Thus, a jury could, as in **Olden**, differently assess the complainant's credibility if it learned that a desire to preserve her relationship provided a motive for her denial that the encounter was fully consensual. Hence, we conclude that Appellant's allegations, if substantiated by evidence of the complainant's commitment to another partner, have arguable merit.

Additionally, we conclude that Appellant's averments satisfy the remaining prongs of his claim. Appellant alleged that counsel lacked a reasonable basis for failing to advocate for the admissibility of the impeachment evidence, and the certified record before us does not reflect that counsel's omission was a strategic choice. Further, where Ms. Doherty admitted that she merely assumed a rape was in progress, and the objective video evidence supported Appellant's defense of consent, the failure of counsel to properly argue that the purportedly-available relationship evidence was admissible to establish a motive to lie is sufficient "to undermine confidence in the outcome of the proceeding." **Evans**, 303 A.3d at 183 (cleaned up).

For these reasons, we conclude that Appellant's allegations make out a *prima facie* case of ineffective assistance. Therefore, the court erred to the extent that it rejected Appellant's claim, without a hearing, based upon the lack of record evidence. Appellant alleged that he has concrete evidence, supplied by the Commonwealth in discovery, to prove his allegations of the

complainant's relationship. That was sufficient to create a genuine issue of fact to be resolved at a hearing. *Accord Commonwealth v. Cousar*, 154 A.3d 287, 307 (Pa. 2017) (remanding for a hearing "or fuller evidentiary development" of a claim that counsel was ineffective in failing to impeach key witness with available evidence). *See also Commonwealth v. Postie*, 200 A.3d 1015, 1023 (Pa.Super. 2018) (*en banc*) ("Generally, an evidentiary hearing on counsel's strategy is preferred before the PCRA court decides if counsel lacked a reasonable basis for his actions, except in those cases where the reasons for counsel's conduct are clear and apparent from the record.").

Therefore, we vacate the PCRA court's order to the extent that it dismissed Appellant's claim that counsel was ineffective in failing to advocate the relevancy of the complainant's committed relationship with her boyfriend. Upon remand, the PCRA court shall hold a hearing to allow Appellant to prove the factual underpinnings of his claim, including counsel's reasons for the chosen course of action, and thereafter rule on his right to relief.

Appellant's final issue concerns trial counsel's handling of a mid-trial investigation into Appellant's interactions with one of the jurors. The PCRA court, relying on the trial court's opinion for Appellant's direct appeal, explained the incident as follows:

> [Appellant] made a brief complimentary remark in passing to one of the jurors outside of the courtroom. When this issue was brought to the court's attention, the juror was interviewed in chambers on the record in the presence of counsel. She confirmed that [Appellant] had had such contact with her, but denied that the incident would have any impact whatsoever on her impartiality

or her ability to continue to serve as a juror. That chambers interview was recorded as follows:

THE COURT: We are now in my chambers with all three attorneys and Juror Number 4. Juror Number 4, one of my tipstaves just reported to me five minutes ago that you reported to her that on more than one occasion over the past couple of days, [Appellant] had or attempted to have some conversation with you at various locations in or around the Justice Center.

Why don't you tell us, ma'am, everything that you can recall about that with as much specificity as you can recall it, please.

JUROR FOUR: Yes. The first encounter I was in the elevator, I believe it was Tuesday, just more or less I had a Starbucks cup in my hand and just a general, I think, comment that the time [*sic*]. I really didn't think much of it. Oh, I should have gotten Starbucks, that is like really good, just works for me, as I was holding it.

THE COURT: Do you remember what time of the day?

JUROR FOUR: After lunch just as we were coming back from lunch. And then yesterday morning, in the hallway out, here I had gotten tied up in the garage because I couldn't get through, I was running a little bit late. I was kind of in a bustle down the hallway. He said good morning to me.

THE COURT: Go ahead.

JUROR FOUR: And then today it was, good afternoon, Miss, on the street by New Haven's Pizza.

THE COURT: What if any response, verbal, nonverbal or otherwise, did you give - did you make when he made those comments -

JUROR FOUR: Nothing.

THE COURT: - or remarks to you?

JUROR FOUR: Nothing. I just kept looking straight ahead.

THE COURT: You certainly have done the right thing of bringing this to my tipstaff's attention and to my attention.

Do you believe that what you just described to me in any way influences your ability to continue to sit as a juror in this case?

JUROR FOUR: No.

THE COURT: It doesn't make you less favorably inclined to the [Appellant] or his legal position in this case?

JUROR FOUR: It makes no difference.

THE COURT: Doesn't make you more favorably inclined to his position in this case?

JUROR FOUR: No.

THE COURT: Does it change your view with regard to the Commonwealth or the Commonwealth's presentation of evidence thus far in this case?

JUROR FOUR: No.

THE COURT: Given what you just told us, do you personally feel able and comfortable continuing to sit as Juror Number 4 in this trial?

JUROR FOUR: Yes.

THE COURT: Any questions from counsel? Hang on. Why don't you step outside to my secretary's area and I'll come out shortly.

JUROR FOUR: Okay. Sure.

THE COURT: What's you [*sic*] question?

[DEFENSE COUSEL]: If he was with anyone else and if she's relayed this to anyone else? Was he alone or was he with -

[THE COMMONWEALTH]: Whether [Appellant] was alone or whether the juror was alone?

[DEFENSE COUSEL]: Whether [Appellant] was alone when he said this.

THE COURT: I am satisfied with her bottom line that whatever it was that happened she felt duty bound and properly so to report it, but that it's not had any impact upon her, is the way I firmly took her assessment to be.

[DEFENSE COUSEL]: Okay.

THE COURT: All right. Thanks.

Notice of Intent to Dismiss, 1/17/24, at unnumbered 3-5 n.1 (cleaned up). Counsel did not offer further protest to the court's conclusion of the investigation and decision to allow the jury to remain on the panel.

Appellant, relying heavily upon decisions by the federal district courts,[4] contends that trial counsel failed to enforce Appellant's due process rights by (1) not objecting to the court's refusal to allow further questioning of the juror, (2) not asking Appellant about the alleged interactions, (3) not finding out whether anyone witnessed them, and (4) not requesting "any remedial measures to combat the effects of a biased juror, such as an instruction not to discuss the encounters with other jurors, the replacement of the contaminated juror with an alternate, or a mistrial." Appellant's brief at 24. Appellant alleges that he has shown a "potential for extreme prejudice under

_____

[4] Appellant also cites a 2014 unpublished memorandum of this Court. **See** Appellant's brief at 22. Since this violates § 65.37 of the Superior Court Internal Operating Procedures, we do not consider that decision. **See** 210 Pa. Code § 65.37(B) (providing, with exceptions not applicable here, that "[a]n unpublished memorandum decision filed prior to May 2, 2019, shall not be relied upon or cited by a Court or a party in any other action or proceeding").

these circumstances," and further suggests that prejudice should be presumed. *Id*. at 25 (citing *Commonwealth v. Stewart*, 295 A.2d 303 (Pa. 1972)).

The PCRA court concluded that Appellant's challenge was premised "upon several critical assumptions without a basis in fact," namely "that the juror's answers to [the trial court's] questions were false, and [the court] erroneously determined that the juror was not tainted." Memorandum, 2/6/24, at unnumbered 1. The court observed that, on the contrary, Appellant had "no basis whatsoever to argue that, somehow, the juror was not being truthful when she candidly and clearly stated that any out-of-court contact with [him] would not impact her continued service as a juror." *Id*. Since the trial court held a hearing to determine whether the juror was capable of being impartial, and found that she was truthful in so proclaiming, any further pursuit of the matter by trial counsel would not have succeeded. *Id*.

It is axiomatic that due process requires that a criminal defendant have a fair trial by an impartial jury whose verdict is based upon evidence developed "in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. State of Louisiana*, 379 U.S. 466, 473 (1965). Stated differently, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith*

*v. Phillips*, 455 U.S. 209, 217 (1982). However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id*.

While, in some extreme circumstances, outside influences or interactions with jurors have been deemed presumptively prejudicial,[5] courts generally analyze "outside intrusions upon the jury for prejudicial impact." *United States v. Olano*, 507 U.S. 725, 738 (1993) (considering whether the presence of alternate jurors during deliberations prejudiced the defendant). *See also Parker v. Gladden*, 385 U.S. 363, 365 (1966) (determining there was prejudice where a bailiff stated that the defendant was "wicked" and "guilty" and one juror who overheard the statements testified that they prejudiced her during deliberations); *Remmer v. United States*, 347 U.S. 227, 230 (1954) (remanding for hearing as to prejudice where a person told the jury foreperson that he could profit from a defense verdict). Either way, "a presumption of prejudice as opposed to a specific analysis does not change

_____

[5] *See*, *e.g.*, *Turner*, 379 U.S. at 473-74 (presuming prejudice where two deputy sheriffs who were key witnesses for the prosecution were in continual contact with the jurors during three days of sequestration as the deputies drove them to and from court, ran errands for them, and conversed and ate meals with them); *Stewart*, 295 A.2d at 304 (presuming prejudice in murder trial where "the father of the victim of the killing . . . was on the panel of jurors from which the trial jury had been selected, and had been in the same room with the jurors who were hearing the case for as long as two and one-half days").

the ultimate inquiry:  Did the intrusion affect the jury's deliberations and thereby its verdict?"  **Olano**, 507 U.S. at 739.

This inquiry is plainly dependent on the particular factual circumstances of the case.  Where the defendant's allegations "satisfy the threshold showing of potential prejudice," they require "further investigation to determine whether [the intrusion] . . . improperly brought to bear an outside influence upon" the affected juror or jurors.  **See Commonwealth v. Jeter**, 296 A.3d 1187, 1201 (Pa.Super. 2023) (holding trial court erred in denying evidentiary hearing on the impact of a juror's discussion of the case with her father during deliberations).  **See also Commonwealth v. Martin**, 348 A.2d 391, 403 (Pa. 1975) (affirming trial court's denial of relief based upon outside influences upon jurors where the trial court conducted a hearing and allowed defense counsel to question the jurors).

As detailed above, the trial court in the instant case conducted an inquiry into the facts surrounding the juror's allegation that Appellant improperly interacted with her outside of the courtroom.  However, the court denied the request of Appellant's counsel to ask whether anyone else witnessed the interactions or if the juror told anyone else about them.  Counsel did not object to this denial, ask the court to question the rest of the jury, or request other relief such as dismissal of the juror, a mistrial, or a curative instruction.  **See**, **e.g.**, **Commonwealth v. Tejeda**, 834 A.2d 619, 623-24 (Pa.Super. 2003) (affirming denial of mistrial after the defendant threw water on the jury as it

recessed for deliberations where the court provided extensive curative instructions and "then polled each juror individually to determine whether he or she could still render a fair and impartial verdict following Tejeda's outburst"). Since it appears that trial counsel did not take measures to ensure Appellant's due process rights as pronounced in the cases described above, we agree with him that this ineffectiveness claim has arguable merit.

Furthermore, because the PCRA court declined to have a hearing on the claim, we are unable to assess whether counsel had a reasonable basis for his decision not to push the issue, and whether Appellant was prejudiced by counsel's inaction.[6] Appellant was on trial to determine whether he acknowledged and respected rules forbidding non-consensual sexual interactions. Juror Four's allegations were that Appellant repeatedly failed to honor rules prohibiting interaction with jurors outside of court. By informing the juror that she did the right thing in reporting the incidents, the trial court appeared to make a finding that Appellant had in fact acted improperly without permitting Appellant to dispute the accuracy of the juror's allegations. If Appellant had been given the opportunity to show that the juror

---

[6] Appellant proffered that counsel was likely to testify at a hearing that he "was caught off guard by the juror's allegations" and was unfamiliar with "the legal standards regarding juror bias." Appellant's brief at 24. He further maintains that he and other witnesses will testify that the juror did not actually speak with Appellant, but rather with other people who were with him during accidental encounters. *Id*. at 25.

misapprehended or misstated the incidents in question, the outcome of the court's ruling as to the juror's ability to proceed impartially may have been different.[7]  Further, even if Juror Four were able to put aside the incidents in deciding Appellant's fate, further investigation may have revealed that she had informed other jurors whose impartiality was tainted by a belief that Appellant had refused to respect rules and boundaries established by the court.

Therefore, we also vacate the PCRA court's order to the extent that it dismissed Appellant's challenge to counsel's stewardship on this matter, and remand for a hearing to allow Appellant to attempt to prove the reasonable basis and prejudice prongs of his claim.  As for prejudice, the PCRA court should consider, *inter alia*, whether its confidence in the outcome of the proceeding is undermined by the evidence Appellant would have proffered had trial counsel properly litigated the matter in the trial court.

In sum, while we affirm the trial court's order to the extent that it dismissed his claim concerning direct appeal counsel's argument for the admissibility of Ms. Doherty's prior assault, we vacate the order insofar as it dismissed his claims regarding trial counsel's handling of the issues concerning

_____

[7] The Commonwealth cites as a basis for rejecting this claim the fact that Appellant himself caused the inappropriate juror contact.  **_See_** Commonwealth's brief at 23-24.  However, Appellant's position is that counsel did not take the necessary actions to disprove that fact by producing evidence that he did not do what Juror Four claimed he had done.  Such evidence, if credited, would tend to undermine her claim of impartiality.

the complainant's boyfriend and Juror Four's allegations and remand for a hearing on those issues.

Order affirmed in part and vacated in part. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/26/2025